Filed 2/2/16  P. v. Burrell CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B254383 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA060633) |
| v. | |
| TYRRAN D. BURRELL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa M. Chung, Judge.  Affirmed.

Cindy Brines, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Margaret E. Maxwell and Nathan Guttman, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant Tyrran D. Burrell, who represented himself at trial, of possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1))[1] and possession of ammunition (§ 30305, subd. (a)(1)). He admitted one prior strike conviction (§§ 667, subds. (a) – (i), 1170.12, subds. (a) – (d)) and six prior prison terms (§ 667.5, subd. (b)). The court sentenced him to a total term of 12 years in state prison. He appeals from the judgment of conviction, contending that the trial court erred in: (1) denying his request to relinquish his pro. per. status, and (2) ordering him to wear a stealth belt at trial. We disagree and affirm.

## BACKGROUND

Because the evidence at trial is unrelated to the contentions on appeal, we only briefly summarize it.

On August 27, 2013, Philip Neher was driving Amy Bowman (an acquaintance) and defendant (Bowman's companion, whom Neher had never met before) to the grocery store, when Neher noticed marked patrol cars behind him. In the rear view mirror of his van, Neher saw an arm movement between Bowman and defendant, who were seated behind him, as if a bulky object had been handed off. The patrol cars turned on their lights, and Neher pulled over.

Los Angeles County Sheriff's Deputy Diego Andrade stopped Neher's van for minor traffic violations. As he approached the van, he noticed defendant twisting his body to the left. As Deputy Andrade spoke with Neher, Bowman's head "popped out" between the two front seats. Neher told Deputy Andrade that he had seen defendant hand something to Bowman.

---

[1] All further statutory references are to the Penal Code.

2

In a search of the van, within arm's length of where defendant was sitting, and in the area where Bowman had appeared, Deputy Andrade found a loaded semi-automatic .45 caliber pistol wrapped in a black nylon holster. Next to the gun was a second magazine containing six live rounds.

According to Neher, he never kept a gun in the van. After waiving his *Miranda* rights, defendant was questioned by Deputy Andrade. Initially, he denied knowledge of the gun. After Deputy Andrade told him that Bowman had told the truth about the gun, defendant said that he had seen and held the gun on previous occasions but did not know it was in the van. He admitted that his fingerprints would be on the gun.

The parties stipulated that defendant had been convicted of a felony within 10 years before August 27, 2013.

## DISCUSSION

I.   *Denial of Request to Relinquish Pro. Per. Status*

Defendant contends that the trial court abused its discretion in denying his request to relinquish his pro. per. status, made just before jury selection was to begin. We disagree. Below, we set forth the relevant record in detail, because it largely resolves the contention. In short, it shows that defendant, an experienced felon who chose self-representation because he was dissatisfied with the prosecution's plea offers and with his appointed attorney's engagement in another trial, used his pro. per. status to try to manipulate the court into appointing a new trial attorney – standby counsel – and proceeding with trial immediately, even though stand-by counsel could not reasonably have been ready. Thus, defendant's request to relinquish pro. per. status was not unequivocal, because it was conditioned on appointment of standby counsel as trial counsel and on proceeding

3

without a continuance. In any event, even if the request had been unequivocal, the court did not err in denying it.

### A. *Relevant Proceedings*

#### 1. *Circumstances Leading to Self Representation*

Before his preliminary hearing, defendant represented himself. However, on the day of the hearing, he relinquished his pro. per. status, claiming that he had been unable to prepare. The magistrate appointed a deputy alternate public defender to represent him. After defendant rejected the prosecution's offer of six years, the preliminary hearing was held and defendant was held to answer. When he was arraigned on the information, the same attorney was appointed to represent him.

At the pretrial conference before the scheduled trial date, the court granted a defense motion for a continuance (a necessary witness was in state prison), and set the case for another pretrial conference on November 14, 2013 as day 0 of 22, with a time waiver from defendant.

On the trial date, December 2, 2013, defendant's attorney was engaged in trial and had two other trials trailing. Therefore, he did not announce ready for trial in defendant's case. The trial court trailed defendant's case day-to-day. On December 4, 2013, defense counsel represented that he was still in trial in another case, that in defendant's case he needed to interview a witness who had been ordered out from state prison, and that he contemplated filing a *Pitchess* motion.

The next day, December 5, 2013, day 20 of 22 for trial, the court stated that the case had been trailed from the previous day because defendant had refused to waive time for trial. Defense counsel informed the court that he would be giving his closing argument in his current trial, and would be starting trial in his next case

4

the following day. The court inquired whether defense counsel wished to confer with defendant about the prosecutor's current plea offer of six years in prison. Defense counsel explained that he had conveyed that offer to defendant, as well as a prior four-year offer and a 32-month counteroffer, all of which defendant had rejected.

The court, with defense counsel's concurrence, suggested that "realistically we're looking at . . . probably January 6 or 7 as a zero of ten for a jury trial setting." The court asked defendant if he wanted that date. Defendant replied, "No. . . . If that's the only reason that's holding me back, I would like to exercise my *Faretta* rights and represent myself, . . . or ask for new counsel." After clarifying that he did not want a *Marsden* hearing to explain any concerns he might have with his attorney's representation, defendant asked to represent himself, and affirmed that he was ready to start trial, which the prosecutor estimated would take four to six days.

During a brief recess, defendant completed a *Faretta* waiver form. When proceedings resumed, the court noted that on the form, defendant wrote that he was exercising his right of self-representation "under duress." The court stated, "I can't accept a pro. per. when you say it's under duress, because it has to be a knowing, understanding, and voluntary waiver." Defendant responded, "Is it possible that I could get new counsel then? If that's the only way I can preserve my rights to a speedy trial, that's the way I want to go, and it won't be under duress."

The court replied that he was not entitled to new counsel at that point, and offered to again hold a *Marsden* hearing for defendant to voice any complaints about his current attorney. When asked if he wanted to reconsider retaining his current counsel, defendant said that he did not "want him, because he clearly stated some offers that the People had offered me, he never told me nothing about it. . . .

5

I made numerous counteroffers all the way down to low-term. I would willingly take low-term at 50 percent."

The court explained that making a counteroffer was "a separate issue from the decision to go pro. per." In a colloquy with the court, defendant affirmed that his decision to represent himself was knowing and voluntary, then stated that his attorney had "coerced" him because the attorney was currently engaged in another trial. The court explained, "Well, sir, you can't have it both ways. I tried to explain to you all the options. I can start the jury selection tomorrow if you're granted pro. per., but you are not going to be able to complain later that you didn't know what you were doing."

In a subsequent colloquy, defendant affirmed that his waiver of his right to counsel was knowing and voluntary. Among other things, the court advised defendant that "if a jury gets ordered tomorrow, we will not delay. You're not going to be able to say that you changed you mind." Defendant affirmed that he understood, but then asked if it was "possible to go co-counsel?"

The court replied that he was not entitled to have co-counsel, but the court would appoint a bar panel attorney as standby counsel. The court explained that standby counsel would not be appointed to help defendant, but rather "for the court, because if at any point during the proceedings you act up or fail to comply with any courtroom rules and protocol, they will be ordered to take over, and the fact that they might be unprepared is not going to be a reason to continue it." Defendant affirmed that he understood, and that he did not want to reconsider his decision to represent himself. The court then granted his *Faretta* request.

The court ordered 40 jurors for the next day, and discussed with defendant and the prosecutor the court's procedures, among other issues. Defendant then made a counteroffer of probation with a suspended sentence (the court explained

that such a counteroffer was not realistic given defendant's prior record), followed by a counteroffer of the low term of 16 months in state prison (which the prosecutor rejected), then followed by a counteroffer of the mid-term of two years with no strike prior (which the prosecutor also rejected). The prosecutor proposed a possible offer (subject to approval) of four years (the mid-term of two years, doubled for the strike offense). Defendant rejected the offer. The court adjourned to the next day to begin jury selection.

2. *Request to Relinquish Self-Representation On Day of Jury Selection*

The next morning, December 6, the court appointed stand-by counsel. The court again explained to defendant that standby counsel was "not here to help you."

The court then stated that that "it look[s] like there were some inmate discipline reports regarding a refusal to obey orders, other noncompliance," copies of which the court had provided to defendant and the prosecutor.[2] The court stated that it would have defendant restrained with a stealth belt that could not be seen by the jury.

Standby counsel interrupted to state: "I just want to let the court know that it has been indicated to me it is possible Mr. Burrell is considering relinquishing his pro. per. status." The court replied that the request was "a little untimely. I went at length with Mr. Burrell regarding this. We have now ordered jurors. For him to relinquish now his pro. per. privileges, it would be going back to [his prior appointed attorney], which is the normal policy. As has already been explained to him, he is in back-to-back trials in department A20. And one thing I did not want

---

[2] We discuss those reports below when we address defendant's contention that the court erred in ordering that he be restrained at trial.

to do was to waste jurors. So at this time we're going to proceed with jury selection." The court directed that the jurors be brought in to start jury selection.

Defendant asked, "So there is no possible way to relinquish and turn my status over to . . . [m]y standby?" The court replied, "No, sir. I explained the role of standby. You can't just get another attorney next day in which jurors are ordered saying you are relinquishing pro. per. Let's call for the jurors and we'll begin jury selection."

Defendant then asked, "Can I talk to you about the disciplinary action? I was in an honor dorm. I just left the honor dorm to go to the . . . ." The court interrupted: "Sir, you have copies of it. As I indicated, I am not revoking your pro. per. privileges because of that. But I am admonishing you that any future in-court or out-of-court misconduct can result in that."

Defendant then complained that he had "no access to no legal anything. These are the pencils that I've got. I have not got writing paper of my own. That's why I wanted to relinquish pro. per. status to someone that's available." The defendant was given writing paper shortly thereafter. Then the court observed: "Sir, you were adamant yesterday about going pro. per. We've signed the pro. per. orders. I am not going to waste these jurors. We are proceeding with the trial. Please do not interrupt once the jurors come in."

Defendant then tried again: "Is it possible to go co-counsel, then?" When the court said he could not (the request had been denied the previous day), defendant protested: "If he is standby – I mean, what is the purpose for him if he can't take over when I am not able to take over?" The court explained: "[T]here is no indication that you are not able to represent yourself, sir. We went through this fully yesterday. You made a full, knowing, understanding and voluntary waiver. You have repeatedly refused to waive your speedy trial rights. You were adamant

8

about the representation. . . . You were given the paperwork. We are not going to delay the proceedings anymore. I am admonishing you there are to be no more interruptions, particularly once these jurors start coming. And I believe they are walking in right now."

Jury selection then proceeded.

### 3. *Requests to Relinquish Pro. Per. Status After Jury Selection*

After the jury was sworn, defendant again protested: "See. I don't understand. I mean, I don't have no access to nothing legal. That's why I want to turn this over to my alternate because I can't do it. . . . I did it under duress. And I am stating to the court right now that I am not going to be able to do it because I don't have access to nothing. I got a pencil in my hand."

The court denied defendant's request to have standby counsel take over, but permitted defendant to confer with him: "He is standby. He is not your advisory. However, I will make an exception, since we have recessed early, to the extent that you want to ask him a few questions, you can. But he is not your attorney. He cannot be sitting there actively advising you in front of the jury. You don't have to take that opportunity. But if you want to do that, I will depart from normal procedure." Defendant said that he would do so.

Before opening statements, defendant tried again: "I'd like to go on record one more time, see if I can hand my case off to my stand-by." The court explained that defendant would have to hand the case off to his appointed attorney, not standby counsel. The court also noted that defendant had "previously asked to go pro. per. and then relinquished" pro. per. status at the preliminary hearing. Nonetheless, the court instructed standby counsel to sit near defendant and assist him with exhibits if they were to be presented to a witness.

9

### 4. *No Error in Denying Relinquishment of Pro. Per. Status*

As our summary of the relevant proceedings makes clear, defendant's several requests to relinquish his pro. per. status were simply attempts to manipulate the court into appointing a new attorney to represent him at trial, even though he was not entitled to one, rather than having prior counsel reappointed and submitting to a continuance. On appeal, defendant focuses solely on the request made immediately before jury selection. He contends that the trial court erred in denying the request without considering relevant factors. He is mistaken.

The decision whether to grant or deny a request to relinquish pro. per. status during trial rests in the discretion of the trial court. (*People v. Lawrence* (2009) 46 Cal.4th 186, 192 (*Lawrence*).) The request must be unequivocal. (*Id.* at p. 193.) Assuming an unequivocal request is made, a non-exhaustive list of relevant factors to evaluate the request includes "'(1) defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney.' [Citation.]" (*Id.* at p. 192.) However, "'"[w]hile the consideration of these criteria . . . is obviously relevant and helpful to a trial court in resolving the issue, they are not absolutes, and in the final analysis it is the totality of the facts and circumstances which the trial court must consider in exercising its discretion as to whether or not to permit a defendant to again change his mind regarding representation in midtrial."'" [Citation.]" (*Ibid.*)

Here, at the time defendant requested to represent himself, his court-appointed attorney's engagement in another trial, as well as his need to interview an in-custody witness in defendant's case and perhaps prepare a *Pitchess* motion, constituted good cause in the trial court's discretion to grant a brief continuance of the defendant's trial, despite defendant's refusal to waive time.  (See *People v. Sutton* (2010) 48 Cal.4th 533, 555 [unavailability of court-appointed counsel because of engagement in another trial may constitute good cause under § 1382 to continue trial over defendant's objection, even in the absence of other exceptional circumstances].)  However, rather than face the prospect of a continuance, and dissatisfied by the prosecution's offers, defendant chose to represent himself.  The next day, just before jury selection was to begin, with jurors about to enter the courtroom, he sought to relinquish his pro. per. status and have his stand-by counsel appointed to represent him (either solely or as co-counsel).  Because stand-by counsel had been appointed for the purpose of taking over only in the event defendant engaged in disruptive behavior, defendant's change of heart as to whether he was ready for trial did not entitle him to have stand-by counsel appointed for trial.  Further, the record is clear that defendant was not asking for, and did not want, the reappointment of the attorney he had relieved, which would necessitate a continuance.  He wanted stand-by counsel, and only stand-by counsel, appointed to represent him, and wanted the trial to proceed immediately.  Of course, having been appointed that day, and having no familiarity with the case, stand-by counsel could not reasonably have been prepared for trial, and the court could not have compelled him to proceed without a continuance.  Under these circumstances, defendant's request to relinquish his pro. per. status was not unequivocal, because it was necessarily conditioned on the appointment of stand-by counsel as trial counsel, and on the trial proceeding that day without delay.  On

11

this basis alone, the trial court did not abuse its discretion in denying defendant's request to relinquish self-representation.

In any event, even if we assume that the request was unequivocal (it was not), it is clear that the totality of circumstances of which the court was aware justified the court's ruling. This was not the first time defendant had requested, then relinquished, self-representation. Defendant had previously requested pro. per. status before his preliminary hearing, and then relinquished that status on the day of the hearing, claiming he was not prepared. As to the request to relinquish at issue, it was made on the day of jury selection, with jurors ready to enter the courtroom. Defendant's stated reason for wanting the appointment of stand-by counsel to represent him – the inability to prepare – was one of the things he had been warned about the previous day when he asked to represent himself. Nonetheless, at that time, he stated he preferred to go to trial. Thus, his stated reason was not a compelling reason to grant his request. (*Lawrence, supra,* 46 Cal.4th at pp. 195-196.) As we have already discussed, it is apparent that defendant was asking the court to appoint stand-by counsel as his trial attorney and to proceed with trial immediately. But, because it was not reasonable for stand-by counsel to proceed immediately with the trial, it was also not possible for the court to meet the terms defendant was demanding. Viewing the circumstances in their totality, we conclude that even if defendant's request to relinquish his pro. per. status was unequivocal, the trial court did not abuse its discretion in denying it.


II.      *Stealth Belt*

Defendant contends that the disciplinary reports on which the court relied to order him restrained during trial did not establish manifest need for restraint. Therefore, he argues that the trial court erred in ordering that he be restrained by a

12

stealth belt during trial. We find no abuse of discretion; assuming the court erred, we find no prejudice.

As we have noted, before jury selection was to begin, the trial court stated that that "it look[s] like there were some inmate discipline reports regarding a refusal to obey orders, other noncompliance," copies of which the court had provided to defendant and the prosecutor. According to the first report, dated May 21, 2003, while defendant was in custody on an earlier case, a deputy saw him take an extra lunch. The deputy called out to defendant as he passed, and ordered defendant to approach. Defendant ignored the commands. The deputy again ordered defendant to approach (he complied), and twice ordered him to put the lunch back. Defendant refused, claiming that another inmate had given it to him. The deputy ordered him to display his wristband. He refused. The deputy ordered a second time, and defendant complied. He then complied with the deputy's order to put the lunch back. Shortly afterward, another deputy ordered defendant to step up to the door of the dorm. Defendant ignored the order. The deputy ordered him to approach and bring his property. Defendant approached slowly. A search of his property revealed a ripped county bed sheet and excess medication. When interviewed, he denied taking an extra lunch, but admitted ripping the sheet, taking excess linen, and hoarding medication.

According to the second report, dated October 21, 2005, defendant was "positively identified" by a deputy as being "involved in a major dorm riot," and had injuries "consistent with . . . being involved." Defendant denied any involvement.

Regarding these reports, the court explained: "Sir, be advised that both out of court and in court misconduct can be a basis for revoking your pro. per. privileges. I am not going to do that because I see these incidents were older. I

13

don't want to swarm the court with security either, so that's why I am explaining to you that's why you have the stealth belt on. You will have a shirt that will cover it so it will not be visible to the jurors."

After a colloquy concerning defendant's request to relinquish his pro. per. status, defendant sought to be heard about the reports: "Can I talk to you about the disciplinary action? I was in an honor dorm. I just left the honor dorm to go to the . . . ." The court interrupted: "Sir, you have copies of it. As I indicated, I am not revoking your pro. per. privileges because of that. But I am admonishing you that any future in-court or out-of-court misconduct can result in that."

Respondent contends that defendant has forfeited his right to object to use of the stealth belt because he did not make a specific objection in the trial court. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 375.) However, defendant attempted to discuss the disciplinary reports, but the court cut him off. The reports were the basis of the order that defendant be restrained. Thus, defendant's attempt to discuss the reports focused on the justification for the court's order, and was sufficient to preserve the issue, as it did not deprive the court of the chance to make its record of manifest need. (Cf. *People v. Partida* (2005) 37 Cal.4th 428, 434 [purpose of specific objection rule regarding admission of evidence to ensure the opportunity for a full record].)

Although defendant preserved the issue, we find no error. A trial court may not order the physical restraint of a defendant absent a showing of manifest need. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 389.) "'"In deciding whether restraints are justified, the trial court may 'take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.' [Citation.] These factors include evidence establishing that a defendant poses a safety risk, a flight risk, or is likely to disrupt the

14

proceedings or otherwise engage in nonconforming behavior." [Citation.] Although the court need not hold a formal hearing before imposing restraints, "the record must show the court based its determination on facts, not rumor and innuendo." [Citation.] The imposition of physical restraints without evidence of violence, a threat of violence, or other nonconforming conduct is an abuse of discretion. [Citation.]' [Citation.]" (*Id.* at p. 389.)

However, "the basis for a finding of manifest need [not] be a showing of prior conduct of the exact type about which the court is concerned, or that the defendant himself personally had engaged in such conduct. A court's decision about the use of restraints involves a prediction of the likelihood of violence, escape, or disruption weighed against the potential burden on the defendant's right to a fair trial. Given the serious potential consequences on both sides of the scale, the range of factors the court may consider in assessing and weighing the risks should be broad." (*People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 390.)

"'[W]e will not overturn a trial court's decision to restrain a defendant absent "a showing of a manifest abuse of discretion."' [Citation.] To establish an abuse of discretion, defendants must demonstrate that the trial court's decision was so erroneous that it 'falls outside the bounds of reason.' [Citations.] A merely debatable ruling cannot be deemed an abuse of discretion. [Citations.] An abuse of discretion will be 'established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice . . . ."' [Citation.]" (*People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at p. 390.)

Here, although the disciplinary reports were from incidents in 2003 and 2005 (trial was in 2013), we cannot say that the trial court abused its discretion. In

15

the 2003 incident, defendant repeatedly refused to comply with orders of custodial deputies and violated jail rules by ripping a bed sheet, taking excess linen, and hoarding medication. In the 2005 incident, he was involved in a major dorm riot and suffered injuries. Based on this evidence, the trial court's determination of manifest need – that defendant posed a risk of violence or of disrupting trial proceedings – did not fall outside the bounds of reason.[3]

Even if we assume the trial court erred, the error was harmless beyond a reasonable doubt. Where the restraint was not seen by the jury, the California Supreme Court has "consistently found any unjustified or unadmonished shackling harmless." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583.) Here, the stealth belt was not visible to the jury, and nothing in the record suggests that the jury was aware of it or that it interfered with defendant's ability to represent himself. Absent a showing of prejudice in the record, any error in ordering defendant restrained by the stealth belt was harmless beyond a reasonable doubt. (*People v. Manibusan* (2013) 58 Cal.4th 40, 86, and cases therein cited.)

---

[3] We note that at his sentencing hearing, defendant repeatedly interrupted the judge, disrupted the proceeding, and ignored the judge's orders to cease his behavior. We mention this incident not as a post hoc justification for the trial court's ruling, but to illustrate the reason why the trial court is given broad discretion over court security, and why appellate courts should not interfere absent a clear abuse of discretion.

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


COLLINS, J.


17